**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| JUNHO BANG, | Case No. 25-12298 (KBO) |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF SOOGEUN OH IN SUPPORT OF**
**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN**
**PROCEEDING; (II) RECOGNITION OF FOREIGN REPRESENTATIVE;**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Soogeun Oh, to the best of my information and belief, state as follows:

1.     I am the receiver (in such capacity, the "Receiver") and authorized foreign representative (in such capacity, the "Foreign Representative") of Mr. Junho Bang (the "Debtor" or "Mr. Bang"), who is the subject of a proceeding (Case Number: Seoul Bankruptcy Court 2025Hoedan142 Rehabilitation) (the "Korean Rehabilitation Proceeding") under the *Debtor Rehabilitation and Bankruptcy Act* (the "DRBA") currently pending before  the Republic of Korea's Seoul Bankruptcy Court, 101st Single Bench (the "Korean Court").   I submit this declaration (the "Declaration") in connection with the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code.*

2.     I am Professor Emeritus at Ewha Law School in Seoul and a leading Korean scholar in insolvency and corporate law. I have published extensively in these fields, including *Insolvency Law Reform 1998–2007* (2007), *Understanding Insolvency Law* (2008), and *Insolvency Law: Cases and Materials* (2012).   I served as the principal drafter of the DRBA, Korea's current insolvency statute. From 2000 to 2016, I chaired the special committee responsible for the reform

of the Korean insolvency law, including the enactment of the DRBA, a consolidated insolvency statute, as well as committees overseeing amendments to the statute.

3.      Since 1998, I have represented the Korean government in various international organizations, including the World Bank, the International Monetary Fund, and the Asian Development Bank.  I participated in UNCITRAL Working Group V (Insolvency) from 2001 to 2010, served as Vice Chair of UNCITRAL Working Group V from 2003 to 2004, chaired the 42nd Session of the UNCITRAL Commission from 2009 to 2010, and served as Chair of UNCITRAL Working Group III (Online Dispute Resolution) from 2010 to 2014.  From 2013 to 2025, I chaired the Committee on Rehabilitation and Bankruptcy of the Supreme Court of Korea. I have served as Editor-in-Chief of the *KLRI Journal of Law and Legislation* since 2018.  A copy of my curriculum vitae is attached hereto as **Exhibit A**.

4.      In my role as the Receiver of the Debtor, I am familiar with the facts set forth herein. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including documents submitted in courts in the United States and Korea; (c) information supplied to me by other professionals I have retained; or (d) my opinion based upon my experience.  I am an individual over the age of 18 and, if I am called upon to testify, I will testify competently to the facts set forth herein.

## I.      **FACTUAL BACKGROUND**[1]

### A.      **The Debtor's Background**

5.      The Debtor is a citizen of the Republic of Korea who was born in the Republic of Korea on June 26, 1994.  Mr. Bang has always resided in the Republic of Korea and is a Korean

---

[1]      Except as otherwise noted, the Receiver has relied on records available to him, including judgments rendered in the criminal proceedings against the Debtor, as to factual and biographical information regarding the Debtor.

citizen with a registered domicile (prior to his incarceration) in Seoul.  In or about 2018, the Debtor began to develop a cryptocurrency trading program (the "Trading Program"), aimed at exploiting arbitrage opportunities in the cryptocurrency market.[2]  Over the next several years, the Debtor expanded his cryptocurrency business (operated, at least in part, through B&S Holdings ("B&S")).[3]

6.    Beginning in or about June 2022, the Debtor (either directly or through B&S) entered into investment contracts (the "Investment Contracts") with Korean individuals and companies (the "Investors"), pursuant to which the Debtor would manage the Investors' cryptocurrency assets (the "Managed Assets") using the Trading Program.[4]  The Debtor then deposited the majority of the Managed Assets into accounts held in the Debtor's name with FTX Trading Ltd. ("FTX").[5]  Specifically, the Debtor was a "high volume trader on the FTX.com Exchange"[6] who maintained two accounts with FTX: (i) Customer Account No. 1806799 ("FTX Account 799"); and (ii) Customer Account No. 82284765 ("FTX Account 765").[7]

### B.    The Debtor's Involvement with the FTX Bankruptcy Cases

7.    On and after November 11, 2022, FTX and over 100 of its affiliates (collectively, the "FTX Debtors") filed petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court, which proceedings are and were jointly administered as *In re FTX Trading Ltd.*, Case No. 22-11068 (Bankr. D. Del.) (the "FTX Cases").

---

[2]    *See, e.g.,* Avoidance Application at p. 2.

[3]    *Id.* at p. 3.

[4]    *See, e.g., id*; *see also In re FTX Trading Ltd.*, Case No. 22-11068 (Bankr. D. Del.), Docket No. 29346 at ¶ 4 (declaration of Investor Hyung Cheol Lim) and Docket No. 29347 at ¶ 4 (declaration of Investor Ji Woong Choi).

[5]    *See, e.g.,* Avoidance Order at p. 2; Avoidance Application at p. 3.

[6]    *Objection of the FTX Recovery Trust to the Motion of Hyung Cheol Lim, Aimed, Inc., Blocore Pte., Ltd., Ji Woong Choi, and Mosaic Co. Ltd. for an Order, Pursuant to Rules 3001 and 3020(d) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 105(a) and 1142(b), for Leave to Amend Proof of Claim No. 87144 to Correct Claimant's Name and Address* [Case No. 22-11068, Docket No. 29582] at ¶ 3.

[7]    *Id.* at ¶ 3.

8.      As a result of the commencement of the FTX Cases, "the withdrawal of virtual assets [from FTX] was suspended, the Debtor fell into a state of insolvency around that time, unable to repay debts that had reached maturity to [his] creditors."[8]

### 1.      The FTX Claims

9.      On September 11, 2023, the Debtor filed a proof of claim in the FTX Cases related to FTX Account 799 ("Claim No. 50458").[9]  In Claim No. 50458, the Debtor asserted that he held a Customer Claim against FTX consisting of $255,744,265.03 in fiat and crypto holdings as asserted therein.[10]

10.     On October 6, 2023, the Debtor filed a proof of claim in the FTX Cases related to FTX Account 765 ("Claim No. 87144" and, together with Claim No. 50458, the "Initial Claims" or the "FTX Claims").[11]  In Claim No. 87144, the Debtor asserted that he held a Customer Claim against FTX consisting of $100,878,881.85 in fiat and crypto holdings as asserted therein.[12]

11.     Pursuant to an *Assignment Agreement* dated as of January 18, 2023 (the "Assignment Agreement"),[13] the Debtor purported to assign all of his rights in and to his trading

---

[8]      Avoidance Order at p. 2.

[9]      A copy of Claim No. 50458, as was attached to the *Declaration of Brian Glueckstein in Support of Objection of the FTX Recovery Trust to the Motion of Hyung Cheol Lim, Aimed, Inc., Blocore Pte., Ltd., Ji Woong Choi, and Mosaic Co. Ltd. for an Order, Pursuant to Rules 3001 and 3020(d) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 105(a) and 1142(b), for Leave to Amend Proof of Claim No. 87144 to Correct Claimant's Name and Address* [Case No. 22-11068, Docket No. 29583] (the "Glueckstein Declaration") as Exhibit B, is attached hereto as **Exhibit D-1**.

[10]     The Foreign Representative does not believe that the Debtor deposited any fiat currency with the FTX Exchange.  Using the online tool available at https://ftxcustomercode.com/, the Foreign Representative calculated the approximate asserted amount of the Debtor's crypto holdings set forth in Claim No. 50458 at $105,677,836.35.

[11]     A copy of Claim No. 87144, as was attached to the Glueckstein Declaration as Exhibit A, is attached hereto as **Exhibit D-2**.

[12]     The Foreign Representative does not believe that the Debtor deposited any fiat currency with the FTX Exchange.  Using the online tool available at https://ftxcustomercode.com/, the Foreign Representative calculated the approximate asserted amount of the Debtor's crypto holdings set forth in Claim No. 87144 at $59,131,219.96.

[13]     A copy of the Assignment Agreement, as attached to the Svalbard Complaint (as defined below) as Exhibit 1, is attached hereto as **Exhibit E**.

accounts with FTX to Lemma Technologies Inc. ("Lemma"), a Panamanian "paper company"[14] wholly-owned and controlled by the Debtor (the "Lemma Claim Transfer").[15]  The Lemma Claim Transfer was made without any consideration from Lemma to the Debtor.[16]

12.    On July 18, 2024, while he was incarcerated, the Debtor filed proofs of claim in the FTX Cases that purported to amend and supersede Claim No. 50458 and Claim No. 87144 ("Claim No. 96400"[17] and "Claim No. 96401,"[18] respectively and together, the "Amended Claims").  The Debtor filed each of the Amended Claims on behalf of Lemma, in each case stating as follows:

> Lemma is the transferee of the customer claim against the Debtors [i.e. the Initial Claims].  The underlying claim was originally held by Lemma's president, Junho Bang ("JB") in his individual capacity.  On January 18, 2023, JB, in his individual capacity, transferred the claim to Lemma . . .
>
> JB, in his capacity as president of Lemma, inadvertently filed the Initial Claim [i.e. Initial Claims] under his individual name.  The Initial Claim was intended to have been filed in Lemma's name—not in the individual name of Lemma's president . . .[19]

13.    On or about June 16, 2023, more than one year before the Debtor filed the Amended Claims in the FTX Cases purporting to evidence the transfer of the Initial Claims to Lemma, Lemma purportedly agreed to sell the Initial Claims to Svalbard Holdings Limited ("Svalbard") by executing two "trade confirmations" (the "Svalbard Trade Confirmations").[20]  The Svalbard Trade Confirmations, both of which were signed by Mr. Bang on behalf of Lemma, each

---

[14]    Avoidance Application (as defined below) at p. 3.
[15]    *See, e.g.,* Avoidance Order at p. 3.
[16]    *Id*.
[17]    A copy of Claim No. 96400, as was attached to the Glueckstein Declaration as Exhibit D, is attached hereto as **Exhibit D-3**.
[18]    A copy of Claim No. 96401, as was attached to the Glueckstein Declaration as Exhibit C, is attached hereto as **Exhibit D-4**.
[19]    Claim No. 96400 at p. 18; Claim No. 96401 at p. 18.
[20]    Copies of the Svalbard Trade Confirmations, as attached to the Svalbard Complaint as Exhibit 2 and Exhibit 3, are attached hereto as **Exhibit F-1** and **Exhibit F-2**, respectively.

contemplated that Svalbard, Lemma, and the Debtor would enter into definitive transaction documents effectuating such sale after they completed due diligence.

### 2. Other Proceedings in the FTX Cases

14. On January 21, 2025, Hyung Cheol Lim, Ji Woong Choi, and certain affiliated entities filed the *Motion of Hyung Cheol Lim, Aimed, Inc., Blocore Pte., Ltd., Ji Woong Choi, and Mosaic Co. Ltd. for an Order, Pursuant to Rules 3001 and 3020(d) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 105(a) and 1142(b), for Leave to Amend Proof of Claim No. 87144 to Correct Claimant's Name and Address* [Case No. 22-11068, Docket No. 29345] (the "Lim/Choi Claim Amendment Motion").  In the Lim/Choi Claim Amendment Motion, the Investor movants therein (defined in such motion as the "Principals") alleged that "Bang served as the Principals' agent to invest some of their digital assets" pursuant to their Investment Contracts[21] and that the Principals were therefore "the true owners of at least 95% of [Claim No. 87144] (and most likely 100% of the Claim)."[22]  As a result, the Principals sought leave "to amend [Claim No. 87144] and substitute their name for Bang's name as the initial holder of the Claim."[23]

15. Both Svalbard[24] and the FTX Recovery Trust[25] objected to the Lim/Choi Claim Amendment Motion.  The hearing on the Lim/Choi Amendment Motion was adjourned, at the direction of the bankruptcy court, to a date to be determined; as of the date hereof, no hearing has been set on the Lim/Choi Claim Amendment Motion.

### 3. The Debtor's Criminal Conviction[26]

---

[21]    Lim/Choi Claim Amendment Motion at ¶ 2.
[22]    *Id.* at ¶ 12.
[23]    *Id.* at ¶ 1.
[24]    Case No. 22-11068, Docket No. 29518.
[25]    Case No. 22-11068, Docket No. 29582.
[26]    This section describes the facts and conclusions set forth in the August 13, 2024 criminal judgment against the Debtor and is not intended to be a comprehensive recitation of the Debtor's interactions with all Investors.

16.     In May 2019 and February 2022, respectively, B&S entered into Investment Contracts with an entity associated with Haru United Pte., Ltd. ("Haru") and Traum Infotech Co., Ltd. ("Traum").  The Debtor deposited most of the virtual assets owned by Haru, Traum, and other Investors (as well as his own virtual assets) into the FTX Exchange.  After doubts began to arise about FTX's financial soundness in early November 2022, the Debtor falsely told a representative of Haru that B&S had moved 70% of its total assets out of FTX and assured Haru's representative that he would personally backstop all losses caused by an FTX default.  From November 2022 through May 2023, the Debtor also provided falsified reports of accounts and returns to Haru and, as a result, B&S received additional transfers of virtual assets from Haru with the expectation that B&S would manage them.  Similarly, in November 2022, to induce Traum to enter into an Investment Contract, the Debtor falsely told Traum's representative that he personally owned ₩500 billion (approximately $348 million) in virtual assets and that he would personally backstop any losses.

17.     In reality, because withdrawals from the FTX Exchange were frozen, the Debtor used the virtual assets from Haru and Traum to respond to withdrawal requests and profit payment demands from other Investors.  The Debtor also commingled his personal virtual assets with those entrusted to him and B&S, in violation of the Investment Contracts.

18.     In February 2024, the Defendant was arrested on charges of fraud and breach of trust under the Aggravated Punishment for Specific Economic Crimes Act.  On August 13, 2024, the Seoul Southern District Court, 13th Criminal Division rendered a judgment (the "Criminal Judgment"),[27] finding the Debtor had criminally defrauded Haru and Traum and sentencing the Debtor to ten (10) years' imprisonment.  On February 14, 2025, the Seoul High Court affirmed the

---

[27]     A true and correct copy of the Criminal Judgment, together with a certified translation thereof, is attached hereto as **Exhibit Q**.

Criminal Judgment and, on June 26, 2025, the Supreme Court of Korea rejected the Debtor's appeal of his conviction and sentence.

### 4. The NY State Court Action

19.     On January 29, 2024, Svalbard commenced an action (the "NY State Court Action")[28] against Lemma in the Supreme Court of the State of New York, County of New York: Commercial Division (the "NY State Court").  In its complaint (the "Svalbard Complaint"),[29] Svalbard alleges that Lemma "breach[ed] two written and expressly binding trade confirmations," seeking "specific performance of the parties' contracts or, in the alternative, money damages based on [Lemma's] failure to perform."[30]  Svalbard alleges that, after a few months of progress on the due diligence contemplated by the Svalbard Trade Confirmations,[31] Lemma "began to assert that complications had arisen regarding [Lemma's] right or authority to sell the Transferred Claims and that as a result Junho Bang could be exposed to liability to his business associates if the Transactions closed."[32]  Svalbard alleged, however, that Lemma "never provided any concrete evidence" of such assertions.[33]

20.     Based on the docket in the NY State Court Action, Svalbard has been unable to effect service of the Svalbard Complaint on Lemma; to date, Svalbard has applied for[34] and obtained[35] four (4) extensions of its deadline to serve Lemma with the Svalbard Complaint via letters rogatory.  The current deadline for such service is March 3, 2026 and, based on the docket

---

[28]     The NY State Court Action is captioned *Svalbard Holdings Limited v. Lemma Technologies Inc.*, Index No. 650457/2024 (N.Y. Sup. Ct.).

[29]     A true and correct copy of the Svalbard Complaint is attached hereto as **Exhibit G**.

[30]     Svalbard Complaint at ¶ 1.

[31]     *Id.* at ¶ 26.

[32]     *Id.* at ¶ 27.

[33]     *Id.* at ¶ 30.

[34]     NY State Court Action at Doc. Nos. 10, 17, 21, 25.

[35]     NY State Court Action at Doc. Nos. 13, 19, 23, 27.

in such matter, there have been no proceedings in the NY State Court Action to date (excepting the foregoing service deadline extensions and the issuance of letters rogatory).

## II.    THE KOREAN REHABILITATION PROCEEDING

21.    On April 9, 2025, Hyung Cheol Lim and Ji Woong Choi (the "Petitioning Creditors"), two Investors, filed an application for the commencement of rehabilitation proceedings against the Debtor (the "Application to Commence")[36] with the Korean Court. Pursuant to the Application to Commence, the Petitioning Creditors sought the commencement of rehabilitation proceedings pursuant to Article 34 of the DRBA against the Debtor and, given the Debtor's incarceration, the appointment of a receiver pursuant to Article 74 of the DRBA.   On April 11, 2025, the Debtor consented to the commencement of rehabilitation proceedings against him.   On May 2, 2025, the Korean Court rendered a decision (the "Commencement Decision")[37] granting the relief requested in the Application to Commence and commencing such rehabilitation proceedings (i.e. the Korean Rehabilitation Proceeding).

22.    The period for creditors to report claims against the Debtor (together with claims recorded on the creditor list in the Korean Rehabilitation Proceeding, the "Claims") in the Korean Rehabilitation Proceeding was August 21, 2025.   All but three of the parties with recorded or reported Claims are located in the Republic of Korea; the exceptions are Haru and Aimed Pte. Ltd. ("Aimed"), both of which I understand are incorporated in Singapore but headquartered in Seoul, and Svalbard (which I understand is incorporated in the Cayman Islands and headquartered in England).

---

[36]    A true and correct copy of the Application to Commence (without exhibits), together with a certified translation thereof, is attached hereto as **Exhibit H**.

[37]    A true and correct copy of the Commencement Decision, together with a certified translation thereof, is attached hereto as **Exhibit B**.   Pursuant to subsequent orders of the Korean Court, certain of the deadlines set forth in the Commencement Decision have been extended.   Among others, the deadline for the submission of the rehabilitation plan was extended to February 12, 2016.

A.      **The Avoidance Order**

23.     On May 14, 2025, the Receiver commenced a claim for avoidance (2025Hoegi107 Claim for Avoidance) in the Korean Rehabilitation Proceeding (the "<u>Avoidance Action</u>") against Lemma by filing the *Application for Avoidance Claim* (the "<u>Avoidance Application</u>") with the Korean Court.[38]  Pursuant to the Avoidance Application, the Receiver sought to avoid the Lemma Claim Transfer pursuant to Article 100, Paragraph 1, Subparagraphs 1 and 4 of the DRBA.[39]  The Avoidance Application was served on a representative of Lemma in accordance with Korean law on May 20, 2025.[40]

24.     On June 10, 2025, the Korean Court issued a decision and order (the "<u>Avoidance Order</u>"),[41] granting the relief sought in the Avoidance Application.  In the Avoidance Order, the Korean Court determined that "the Debtor transferred the [FTX] Claims to [Lemma] free of charge after falling into a state of insolvency" and that "the Debtor was aware that the transfer of the [FTX] Claims would prejudice the rehabilitation creditors."[42]  Thus, pursuant to the DRBA, under the Avoidance Order, the Assignment Agreement and the Lemma Claim Transfer dated January 18, 2023 were avoided and "deemed to have lost its effect."[43]

25.     In accordance with the DRBA, and as stated at the bottom of the Avoidance Order, if any party objected to the issuance of the Avoidance Order, they were required to initiate an Action for Objection within one month from the date of service.  No party initiated an Action for

---

[38]     A true and correct copy of the Avoidance Application, together with a certified translation thereof, is attached hereto as **Exhibit I**.
[39]     Avoidance Application at p. 4.
[40]     Avoidance Order at p. 3.
[41]     A true and correct copy of the Avoidance Order, together with a certified translation thereof, is attached hereto as **Exhibit C**.
[42]     Avoidance Order at p. 3.
[43]     *Id.*

Objection and the Avoidance Order has not been appealed.  Accordingly, as of the date hereof, the

Avoidance Order is a final, non-appealable order of the Korean Court.

### B.    Svalbard's Active Participation in the Korean Rehabilitation Proceeding

26.    Since June 2025, Svalbard, through their Korean counsel, has been an active

participant in the Korean Rehabilitation Proceeding.  Among other things, and as set forth in

further detail below, Svalbard has asserted and is litigating a claim against the Debtor in the Korean

Rehabilitation Proceeding in relation to the Svalbard Trade Confirmations.

27.    On August 21, 2025, Svalbard filed a *Proof of Rehabilitation Claim* (the "Svalbard

Proof of Claim")[44] in the Korean Rehabilitation Proceeding.  The Svalbard Proof of Claim asserts

a $187,419,280.60 claim against the Debtor for "damages arising from default and/or tortious

acts."[45]  Specifically, Svalbard states the basis for its claim against the Debtor as follows:

> Meanwhile, although Lemma acquired the FTX Claims from the Debtor
> pursuant to the [Assignment Agreement], since such assignment has been
> avoided under Korean law, Lemma has a damage claim against the Debtor
> who, with the fraudulent intent of harming general rehabilitation creditors
> from the outset, committed the act subject to avoidance and then entered
> into the [Svalbard Trade Confirmations] with [Svalbard], thereby causing
> the occurrence of the aforementioned obligation to pay damages.
> [Svalbard] understands that Lemma is a special purpose company (SPC)
> with no other significant assets.  Therefore, [Svalbard] is in a position to
> exercise direct legal rights against the Debtor by subrogation of the damage
> claim that Lemma has against the Debtor.
>
> Separately, since the Debtor, while well aware from the beginning that it
> was an act harmful to [Svalbard], assigned the claims to Lemma and then
> sold them to [Svalbard], [Svalbard] can also directly claim damages from
> the Debtor based on tort.  In fact, the Debtor sold the FTX Claims to
> [Svalbard] through Lemma despite having no intention whatsoever to
> assign the FTX Claims to [Svalbard].  And while delaying the assignment
> of the FTX Claims despite having an obligation to do so under the validly
> executed [Svalbard Trade Confirmations], the present rehabilitation
> proceedings were commenced and an avoidance decision was rendered

---

[44]    A true and correct copy of the Svalbard Proof of Claim, together with a certified translation thereof, is
attached hereto as **Exhibit J**.

[45]    Svalbard Proof of Claim at p. 3.

regarding the Debtor's act of assigning the FTX Claims to Lemma, resulting in the risk that Lemma's contractual obligation would become impossible to perform.  Therefore, as examined above, if the effect of such avoidance decision is recognized equally in the United States and it is definitively determined that Lemma's contractual obligation to [Svalbard] cannot be performed, [Svalbard] will suffer direct damages by not receiving the FTX Claims from Lemma pursuant to the [Svalbard Trade Confirmations].  As such, since the Debtor caused damage to [Svalbard] through a series of acts while fully aware of the possibility of damage occurring to [Svalbard], the Debtor is liable to compensate [Svalbard] for damages arising from tort.[46]

28.     On and around September 18, 2025, during the claim inspection period in the Korean Rehabilitation Proceeding, the Receiver and five of the Debtor's creditors filed a *Notice of Objection* (the "<u>Svalbard Claim Objection Notices</u>")[47] to the Svalbard Proof of Claim pursuant to Article 161 of the DRBA.  As set forth in the Svalbard Claim Objection Notices, the grounds for such objection were: (i) that Svalbard's asserted claim should be required to be proven in the judicial process before the Korean Court; (ii) that the Debtor was not party to the Svalbard Trade Confirmations; and (iii) that the Debtor did not commit a tort against Svalbard.[48]

29.     Thereafter, on October 20, 2025, in accordance with Article 170 of the DRBA, Svalbard filed the *Petition for the Trial on Investigation and Determination of Rehabilitation Claim* (the "<u>Petition for Adjudication</u>")[49] with the Korean Court, requesting a determination from the Korean Court that it holds a claim against the Debtor in the amount of ₩269,602,635,143 ($188,073,665.94).  The Petition for Adjudication commenced a proceeding within the Korean

---

[46]     Svalbard Proof of Claim at pp. 5 – 6.

[47]     True and correct copies of the Svalbard Claim Objection Notices filed by Aimed and Traum, together with certified translations thereof, are attached hereto as **Exhibit K-1** and **Exhibit K-2**, respectively.  A true and correct copy of the Svalbard Claim Objection Notice (which is contained within the Receiver's general objections to Claims), together with a certified translation of the relevant portions thereof, filed by the Receiver is attached hereto as **Exhibit K-3**.

[48]     The Receiver's only asserted ground for objection in his Svalbard Claim Objection Notice was that Svalbard's asserted claim should be required to be proven in the judicial process; the other two grounds were asserted by creditors.

[49]     A true and correct copy of the Petition for Adjudication, together with a certified translation thereof, is attached hereto as **Exhibit L**.

Rehabilitation Proceeding (Case No. 2025Hoehwak718 Allowance of Rehabilitation Claims) (the "Svalbard Claim Allowance Proceeding").

30.     In advance of a hearing before the Korean Court scheduled on December 18, 2025, the Receiver and two of the Debtor's creditors submitted opinions with respect to the Petition for Adjudication and the Svalbard Proof of Claim.[50]  At the December 18 hearing, the Korean Court scheduled a further hearing in the Svalbard Claim Allowance Proceeding for February 5, 2026 and directed all parties to (i) submit written opinions as to the allowance of the Svalbard Proof of Claim in advance of such hearing and; (ii) exchange arguments such that all issues in the Svalbard Claim Allowance Proceeding are identified and exposed prior to the February 5 hearing.

31.     In December 2025, Svalbard filed two requests with the Korean Court, seeking the transmittal of certified copies of all records from the Avoidance Action and the Bang Criminal Proceedings for the express purpose of proving its claim against the Debtor before the Korean Court.

### C.     Commencement of the Chapter 15 Case

32.     On December 18, 2025, the Receiver submitted an *Application for Permission to File a Lawsuit for Recognition of Foreign Insolvency Proceedings* (the "Chapter 15 Authorization Application") with the Korean Court.  In the Chapter 15 Authorization Application, the Receiver requested that the Korean Court "grant authority for the Receiver to exercise rights representing this rehabilitation proceeding in the relevant procedure, and grant permission to proceed with necessary legal procedures in the United States" as set forth therein.[51]  On December 18, 2025, the

---

[50]     True and correct copies of such opinions, together with certified translations thereof, are attached hereto as **Exhibit M-1** and **Exhibit M-2**.
[51]     Chapter 15 Authorization Application at ¶ 3.

Korean Court issued an order (the "Chapter 15 Authorization Order"), granting the relief requested in the Chapter 15 Authorization Application.[52]

33.    Prior to the issuance of the Chapter 15 Authorization Order, on October 27, 2025, the Korean Court sent a letter to the Bankruptcy Court presiding over the FTX Cases, requesting the cooperation and assistance of the Bankruptcy Court "in facilitating smooth coordination" between the FTX Cases and the Korean Receivership Proceeding (the "SBC Letter").[53]   The Bankruptcy Court replied to the SBC Letter (the "Bankruptcy Court Reply") on October 29, 2025.[54]

## III.    THE CHAPTER 15 CASE

### A.    The Debtor is Eligible for Chapter 15 Relief

34.    It is my understanding, based on discussions with my United States restructuring counsel, that in order to be eligible for chapter 15 relief in the Third Circuit, the Debtor must satisfy section 109(a) of the Bankruptcy Code, which requires that the Debtor have either (a) a domicile, (b) a place of business, or (c) property in the United States.  I have been further advised that courts in the Third Circuit have held that contracts governed by United States law, a retainer held by United States counsel, or claims or causes of action against United States entities are each sufficient to allow a foreign entity to be a chapter 15 debtor

35.    I believe that the Debtor satisfies this requirement because the Debtor has property in the United States in the form of the FTX Claims and/or causes of action.  Additionally, utilizing funds from the Debtor's estate (as authorized by the Korean Court), I have provided my United

---

[52]    A true and correct copy of the Chapter 15 Authorization Order, together with a certified translation thereof, is attached hereto as **Exhibit N**.  The Chapter 15 Authorization Application, which sets forth the relief that was granted by the Chapter 15 Authorization Order, is attached thereto.

[53]    A true and correct copy of the SBC Letter is attached hereto as **Exhibit O**.

[54]    A true and correct copy of the Bankruptcy Court Reply is attached hereto as **Exhibit P**.

States restructuring counsel a retainer, which I understand is being held in a Delaware trust account.

**B.      Recognition of the Korean Rehabilitation Proceeding**

36.      I am advised that the Foreign Representative must establish that the Korean Rehabilitation Proceeding is either a "foreign main proceeding" or a "foreign nonmain proceeding" as such terms are defined in section 1502 of the Bankruptcy Code in order for the Korean Rehabilitation Proceeding to be "recognized" under section 1517(a) of the Bankruptcy Code.

37.      I understand that under section 1517(a) of the Bankruptcy Code, a "foreign main proceeding" means a foreign proceeding pending in the country where the debtor has its "center of main interests," also referred to as "COMI." I am advised that an individual debtor's "habitual residence" is presumed to be its COMI. I further understand that "habitual residence" is essentially the same as "domicile," which is established by an individual's physical presence in a location coupled with an intent to remain there indefinitely.

38.      I submit that the facts set forth herein support the conclusion that the Debtor's COMI is in Korea. The Debtor was born in, and has always resided in, Korea and the Debtor is only a citizen of the Republic of Korea. The Debtor is physically present in Korea and I am unaware of any fact that would contravene the fact that the Debtor intends to remain in Korea indefinitely. Indeed, the Debtor is presently incarcerated in Mokpo, Korea.

## IV.    GENERAL OVERVIEW OF KOREAN REHABILITATION LAW

39.    ***Background and Purpose***.  The DRBA,[55] a consolidated insolvency law, became effective on April 1, 2006.  The DRBA repealed four previous Korean insolvency-related laws and consolidated the proceedings thereunder into the following three insolvency regimes: (a) rehabilitation proceedings under Part 2 of the DRBA primarily for the rehabilitation of insolvent entities and individuals; (b) bankruptcy proceedings under Part 3 of the DRBA for the liquidation of insolvent entities and individuals; and (c) rehabilitation proceedings for individuals under Part 4 of the DRBA.

40.    The legislative purpose of the DRBA, as stated in Article 1 thereof, is two-fold: (i) to promote the efficient rehabilitation of debtors and their businesses when financial distress is caused by economic difficulties, by coordinating the legal relationships among interested parties— including creditors, shareholders, and other equity holders—and (ii) to ensure the fair realization and distribution of the debtor's property when rehabilitation is no longer feasible.

41.    ***Commencement of Rehabilitation Proceedings***.  Rehabilitation proceedings in Korea commence when either a debtor or a creditor of the debtor files an application. Parties other than the debtor may file the application to commence a rehabilitation proceeding where facts leading to bankruptcy are likely to arise with respect to the debtor.[56]  When the debtor is not a stock company or limited liability company, this person must be either (i) a creditor who holds a claim equivalent to not less than 50 million won (approximately $35,000), or (ii) an equity right-

---

[55]    A true and correct copy of an English translation of the DRBA provided by the Korea Legislation Research Institute (https://elaw.klri.re.kr/eng_service/lawView.do?hseq=1120&lang=ENG, accessed 12/24/2025) is attached hereto as **Exhibit R**.

[56]    DRBA, art. 34(1)2.

holder who holds an equity share of not less than 1/10 of the total amount of investment of any unlimited partnership, limited partnership, corporation, or anyone equivalent thereto.[57]

42.    Following the submission of an application to commence rehabilitation proceedings under the DRBA, the court then determines whether to issue a commencement order. If a commencement order is entered, the rehabilitation proceedings proceed under the same statutory framework regardless of whether the case was initiated voluntarily or involuntarily.  In other words, there is no legal distinction between voluntary and involuntary rehabilitation after the commencement order is issued.

43.    ***The Court-Appointed Receiver***.  From its commencement to the closing, the court controls the entire rehabilitation proceedings and appoints major players of the proceeding, such as a receiver, an examiner, and the administration commissioner – each of which are subject to the court's approval and delegation.  The court may appoint the existing management as a receiver, or may decide not to appoint a receiver at all, in which case the debtor's existing management assumes the role and duties of a receiver by operation of law.[58] Appointment of a third-party receiver is rare and reserved for exceptional cases. It is also common for the court to appoint an examiner, which is separate from a receiver (when appointed), who conducts due diligence on the debtor's financial condition and business prospects and submits a report to the court.

44.    The court-appointed receiver, who has been described by the Korean Supreme Court as a type of public fiduciary for stakeholders,[59] is exclusively vested with the authority to conduct a debtor's business and manage and dispose of the debtor's assets.[60] The receiver's authority, however, is subject to the court's approval in several situations, including: (i) the act of

---

[57]    DRBA, art. 34(2).
[58]    DRBA, art. 74(3), 74(4).
[59]    Supreme Court Decision 2010Da63836, March 28, 2013.
[60]    DRBA, art. 56(1).

disposing of any assets; (ii) the act of acquiring any assets by transfer; (iii) the act of leasing assets, including the borrowing of any funds; (iv) the act of cancelling or terminating any contract pursuant to the provisions of Article 119 of the DRBA; (v) the act of filing a lawsuit; (vi) the act of making a compromise or concluding any arbitration agreement; (vii) the act of relinquishing any rights; (viii) the act of approving common benefit claims or rights of re-acquisition; and (ix) other acts designated by the court.[61] Without obtaining approval from the court, such actions are considered void. The receiver is also required to perform his or her duties with the due care of a prudent manager.[62]

45.    ***The Rehabilitation Plan***.  In addition to conducting the debtor's business and managing and disposing of the debtor's assets, the receiver must submit a list of creditors to the court,[63] and is required to submit a rehabilitation plan to the court.[64]  The plan is voted on at a meeting of interested parties.  Approval of the plan requires affirmative votes of at least: (i) two-thirds of the filed amount in the class of general unsecured creditors, (ii) three-quarters in the class of secured creditors, and (iii) a majority of issued shares in the class of shareholders.[65] However, the court may only confirm an approved plan if the statutory requirements are satisfied, including the best interest of creditors.[66]  Similar to the Bankruptcy Code, the DRBA provides a mechanism for the court to approve a rehabilitation plan despite a dissenting class, if the plan provides adequate protection to the dissenting class.[67]

46.    The receiver is responsible for the implementation of a confirmed plan.  The court may conclude the rehabilitation proceedings after the first payment is made under the plan unless

---

[61]    DRBA, art. 61.
[62]    DRBA, art. 82(1).
[63]    DRBA, art. 147.
[64]    DRBA, art. 220.
[65]    DRBA, art. 237.
[66]    DRBA, art. 243.
[67]    DRBA, art. 244.

early closure would impede its continued implementation.[68]  The court may also discontinue the proceedings if a draft plan is not approved within the statutory time limit,[69] or if it becomes evident that the confirmed plan cannot be implemented.[70]

47.     ***Impact of Commencement of Rehabilitation Proceeding***.  After a commencement order is entered, creditors are prohibited from exercising individual enforcement rights against the debtor or the debtor's property.[71]  The following actions are also prohibited or suspended (if pending) after rehabilitation proceedings are commenced: (i) a petition for bankruptcy or an application for the commencement of rehabilitation proceedings; (ii) compulsory execution, provisional seizure, preliminary injunction, or the exercise of security rights; and (iii) administrative measures relating to tax enforcement.[72]

48.     ***Claims Process***.  To participate in the rehabilitation proceeding, creditors must report their claims to the court.[73] As noted above, the receiver submits a list of creditors to the court.[74]  Claims recorded on the receiver's creditor list are deemed reported without the need for further action by those creditors.[75]

49.     The receiver, the debtor, or any creditor whose claim is either recorded on the creditor list or separately reported may raise an objection to the court regarding the existence or the amount of a recorded or reported claim.[76]  When a claim is disputed, the creditor whose reported claim is the subject of an objection may seek a judicial determination by filing an

---

[68]     DRBA, art. 283.
[69]     DRBA, art. 286.
[70]     DRBA, art. 288.
[71]     DRBA, art. 58.
[72]     DRBA, art. 58.
[73]     DRBA, arts. 148-49.
[74]     DRBA, art. 147.
[75]     DRBA, art. 151.
[76]     DRBA, art. 161.

application for claim allowance proceedings.[77]  A resulting judgment, rendered by the bankruptcy court, from the claim allowance proceedings determines the existence of the disputed claim and its contents.[78]  A party dissatisfied with a claim allowance judgment may file a civil lawsuit objecting to this judgment within one month from the date of service of the written decision.[79] Such lawsuits are then adjudicated by the district court under the Civil Procedure Act as ordinary civil litigation.

50.    ***Avoidance Actions***.   The receiver also has the ability to commence lawsuits to exercise certain avoidance powers and pursue claims for avoidance, and as a defense in other litigation.[80]  To succeed on an avoidance lawsuit, claims for avoidance, or an avoidance defense, the receiver must prove: (i) an act performed by the debtor with knowledge that such act is detrimental to creditors; (ii) an act by the debtor that is detrimental to creditors and an act of furnishing any security or extinguishing any debt by the debtor after the payments are suspended; (iii) the act of furnishing any security or extinguishing any debt by the debtor, which does not pertain to the debtor's obligations and whose method and time do not pertain to the debtor's obligations, after or within 60 days before the suspension of payment; or (iv) a gratuitous act or act for consideration that can be deemed identical to the former, which is performed by the debtor after or within six months before the suspension of payments or other such procedure is made.[81]

51.    When an avoidance lawsuit or claim for avoidance proceedings are commenced, the counterparty or defendant receives notice of the action and is provided an opportunity to respond and oppose the receiver's arguments. The court must examine the counterparty, and the

---

[77]    DRBA, art. 170(1).
[78]    DRBA, art. 170(3).
[79]    DRBA, art. 171(1).
[80]    DRBA, art. 105.
[81]    DRBA, art. 100.

counterparty may present objections to the receiver's position during that examination.[82]   If avoidance issues arise as part of a defense asserted by the receiver in separate civil litigation, the counterparty may challenge that defense in accordance with the rules governing the relevant lawsuit.

52.     Following the court's examination of the defendant and an opportunity to object to the action, the court will issue a decision on the avoidance action. Such judgment becomes final if no appeal is filed within the statutory appeal period, which is two (2) weeks from the date the written judgment is served.  A party dissatisfied with a decision citing a claim for avoidance may file a civil lawsuit objecting to that decision within one (1) month from the date of service.[83]

*[Remainder of page intentionally left blank]*

---

[82]     DRBA, art. 106(3).
[83]     DRBA, art. 107.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 31st day of December 2025
Seoul, Republic of Korea

Professor Soogeun Oh